# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**WORLDWIDE AIRCRAFT SERVICES Inc.,**
d/b/a JET ICU

      Plaintiff,

v.                                    Case No. 8:24-cv-02927-WFJ-SPF

**AETNA Life Insurance Company**,

      Defendant.

_____/

## ORDER

Before the Court is AETNA Life Insurance Company's ("Aetna" or the "Defendant") Motion to Dismiss the Complaint filed by Plaintiff Worldwide Aircraft Services, Inc. d/b/a Jet ICU ("Jet ICU" or the "Plaintiff") pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] Dkt. 21. Jet ICU has responded in opposition, Dkt. 24, and Defendant replied. Dkt. 31. As explained below, Defendant's motion to dismiss is granted because Aetna is entitled to Eleventh Amendment Immunity.

## BACKGROUND

Plaintiff Jet ICU alleges that on or about February 7, 2020, D.S. ("Patient") was an insured beneficiary under a health insurance policy provided by Defendant

---

[1] While Defendant purports to be seeking dismissal under Rule 12(b)(6), Dkt. 21 at 4, it raises Eleventh Amendment immunity claims which would require the Court to apply a Rule 12(b)(1) standard.

Aetna. Dkt. 1 ¶ 5. On the same day, Plaintiff contends that Patient suffered a medical emergency that required immediate air transportation from Mexico to Tampa, Florida. *Id.* ¶¶ 6–8. The treating physician determined that immediate air medical transportation was appropriate and necessary for the treatment of Patient's condition. *Id.* ¶ 7.

At the time of the air transportation, Plaintiff did not have a pre-negotiated contract with Aetna, and Plaintiff was not part of Aetna's provider network. *Id.* ¶ 10. Following the transportation of Patient, Plaintiff billed Aetna $206,730.00 for the ground and air transportation services rendered based on its "usual and customary rate." *Id.* ¶¶ 8, 12. Aetna only paid $13,839.83 on the claim, leaving $192.890.17 outstanding. *Id.* ¶ 51.

Importantly, Patient D.S., the Aetna "member" at issue, is actually covered under the Texas Public School Retired Employees Group Benefits Program, a Texas state health benefits program (the "Plan"). Dkt. 21-1 ¶ 5; *see* Tex. Ins. Code § 1575.001, *et seq.* The Texas Public School Retired Employees Group Benefits Act (the "TRS Act" or the "Act"), set forth in Chapter 1575 of Subtitle H ("Health Benefits and Other Coverages for Governmental Employees") of Title 8 ("Health Insurance and Other Health Coverages") of Texas's Insurance Code created, enables, and regulates the Teacher Retirement System of Texas ("TRS"). TRS is statutorily defined as the "trustee" who "shall administer the fund." Tex. Ins. Code

2

§ 1575.002(7); *id.* § 1575.301(b). TRS is authorized to take "actions it considers necessary to devise, implement, and administer the group program." *Id.* § 1575.051; *see also id.* § 1575.002(4) (defining "group program" as the "Texas Public School Employees Group Insurance Program authorized by this chapter"). This authority includes allowing TRS to "contract directly with a health care provider, including a health maintenance organization, a preferred provider organization, a carrier, an administrator" in order to "provide benefits to participants in" the Plan. *Id.* § 1575.109. TRS contracted with Defendant Aetna to administer the Plan on September 27, 2016 (the "Contract"). Dkt. 31-1 at 61 (showing the Contract between Aetna and TRS).

On December 18, 2024, Plaintiff filed suit. In the Complaint, Plaintiff asserts three counts: (1) Civil Theft under Fla. Stat. § 772.11, (2) Conversion, and (3) Quantum Meruit. Dkt. 1. In response, Defendant filed the instant motion to dismiss, arguing that: (1) under the Eleventh Amendment, sovereign immunity requires dismissal of this action against the administrator of Texas's employee benefits plan; (2) even if Aetna, as TRS's administrator, were subject to suit in this action, each count is preempted by the Airline Deregulation Act (the "ADA"); (3) none of the counts sufficiently alleges a claim for relief; and (4) an exclusive venue-selection provision requires transfer to the Western District of Texas. Dkt. 21 at 2.

3

# LEGAL STANDARD

## I.    Rule 12(b)(1) Standard

Federal courts are courts of limited jurisdiction "'empowered to hear only those cases within the judicial power of the United States as defined by Article III of the Constitution,' and which have been entrusted to them by a jurisdictional grant authorized by Congress." *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 409 (11th Cir. 1999) (quoting *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994)). Challenges to subject matter jurisdiction under Rule 12(b)(1) are either "facial"[2] or "factual." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990).

A factual attack, as Defendant Aetna seems to assert here,[3] "challenge[s] 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.'" *Id.* (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). When the attack is factual, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," and "the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* (quoting *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th

---

[2] A "facial attack" is based solely on the pleadings and requires the court to assess whether the plaintiff has alleged a sufficient basis for subject matter jurisdiction. *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).

[3] Defendant Aetna does not address whether it is raising a facial or a factual attack. *See* Dkt. 21 at 4–6; Dkt. 31 at 12. While Aetna is silent as to what standard applies to its Rule 12(b)(1) challenge, the Court construes Defendant to be making a factual attack since it relies on the outside declarations and exhibits not part of the pleadings. Dkt. 21-1; Dkt. 31-1.

Cir. 1981)). "A dismissal for lack of subject matter jurisdiction is not a judgment on the merits and is entered without prejudice." *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008).

## II.    Rule 12(b)(6) Standard

A complaint withstands dismissal under Federal Rule of Civil Procedure 12(b)(6) if the alleged facts state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard does not require detailed factual allegations but demands more than an unadorned accusation. *Id.* All facts are accepted as true and viewed in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

## DISCUSSION

Based on a careful review of the pleadings, the Court grants Defendant's motion to dismiss. As discussed below, Defendant is an arm of the State that is entitled to Eleventh Amendment immunity.

## I.    Eleventh Amendment Immunity

The Court begins, as it must, with the text of the Constitution. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of

any Foreign State." U.S. Const. Am. XI. The purpose of the Eleventh Amendment is to "shield[] states from suit in federal courts without their consent, leaving parties with claims against a State to present them, if the State permits, in the State's own tribunals." *United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 601 (11th Cir. 2014) (quotation marks omitted). As relevant here, "[a]n entity is protected by a State's Eleventh Amendment immunity if it is an arm of the State." *Monroe v. Fort Valley State Univ.*, 93 F.4th 1269, 1278 (11th Cir. 2024) (citing *Lesinski*, 739 F.3d at 602). Aetna insists that (through TRS) it is an arm of the State of Texas. Dkt. 21 at 7. Jet ICU argues that TRS is not an arm of the State; therefore, Aetna cannot claim sovereign immunity. Dkt. 24 at 4.

To determine whether an entity is acting as an "arm of the state" when carrying out a particular function, the Eleventh Circuit has outlined four factors: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." *Manders v. Lee*, 338 F.3d 1304, 1309 (11th Cir. 2003) (en banc). "[W]hether an entity is an 'arm of the State' for Eleventh Amendment purposes is ultimately a question of federal law. But the federal question can be answered only after considering provisions of state law." *Id.* The Eleventh Circuit has identified factors (1) "how state law defines the entity" and (4) "who is

responsible for judgments against it" as the most important. *Monroe*, 93 F.4th at 1279 (citations omitted).

Because Jet ICU is challenging whether TRS and Aetna are arms of the State of Texas, the Court will have to apply the *Manders* factors twice. Once for TRS (to determine if it is entitled to sovereign immunity) and once more for Aetna as TRS's contracted third-party administrator.

a. *How Texas Law Defines TRS*

The Court begins with the text of the TRS Act. As the Eleventh Circuit teaches, the way state law defines an entity is crucial in determining its arm-of-the-state status "because states have extremely wide latitude in determining their forms of government and how state functions are performed[.]" *Manders*, 338 F.3d at 1309 n.10. A review of Eleventh Circuit caselaw on the first *Manders* factor shows that courts consider "how the enabling legislation describes the entity, the stated purposes of the entity, on whose behalf the entity performs its functions, whether the entity is subject to state or local control, how employees of the entity are described, the powers of the entity, and the entity's relationships to other government entities like municipalities and counties." *Coffey v. Higher Educ. Loan Auth.*, No. 5:24-CV-270-MMH-PRL, 2025 WL 770396, at *7 (M.D. Fla. Mar. 11, 2025) (first citing *Pellitteri v. Prine*, 776 F.3d 777, 780 (11th Cir. 2015); then citing *Lightfoot v. Henry*

*Cnty. Sch. Dist.*, 771 F.3d 764, 769–71 (11th Cir. 2014); and then citing *Williams v. Dist. Bd. of Trs. of Edison Cmty. Coll.*, 421 F.3d 1190, 1192–93 (11th Cir. 2005)).

Importantly, the Eleventh Circuit has also noted that federal courts should "give[] great deference to how state courts characterize the entity in question." *Monroe*, 93 F.4th at 1279 (citing *Versiglio v. Bd. of Dental Examiners of Alabama*, 686 F.3d 1290, 1292 (11th Cir. 2012)); *see also McAdams v. Jefferson Cnty. 911 Emergency Commc'ns Dist.*, 931 F.3d 1132, 1134–35 (11th Cir. 2019) (rejecting sovereign immunity defense and relying on state supreme court decision that entity analogous to defendant was not "agency of the state"); *Walker v. Jefferson Cnty. Bd. of Educ.*, 771 F.3d 748, 755–56 (11th Cir. 2014) (relying on Alabama Supreme Court holding that local school boards were not arms of the State concerning employment decisions).

Here, the TRS Act defines TRS as a sovereign instrumentality of Texas. First, TRS is a state-created entity. TRS is statutorily defined as the "trustee" who "shall administer the fund." Tex. Ins. Code § 1575.002(7); *id.* § 1575.301(b). The Act describes the fund as a "retired school employees group insurance fund[, which] is a trust fund with the comptroller, who is custodian of the fund." *Id.* § 1575.301(a); *see also id.* § 1575.101 ("The Teacher Retirement System of Texas is the group plan holder of a plan established under this chapter.").

Second, TRS's powers under the Act mirror the powers of a state agency. TRS is statutorily tasked with the responsibility to take "actions it considers necessary to devise, implement, and administer the group program." *Id.* § 1575.051; *see also id.* § 1575.002(4) (defining "group program" as the "Texas Public School Employees Group Insurance Program authorized by this chapter"). Like a state agency, this authority includes the ability to "adopt rules, plans, procedures, and orders reasonably necessary" to provide insurance coverage. *Id.* § 1575.052(a). As discussed above, the Act permits TRS to contract with a private entity to collect contributions or settle claims in connection with the Plan. *Id.* § 1575.108.

Third, much like a sovereign instrumentality, TRS's enabling statute expressly disclaims the applicability of insurance statutes and insurance common law. *Id.* § 1575.008 (exempting TRS "from any other insurance law, including common law, that does not expressly apply to the plan or this chapter"). TRS is also exempt from state taxes and fees, *id.* § 1575.007, and any money in the fund is exempt from "execution, attachment, garnishment, or any other process." *Id.* § 1575.006(a)(3).

Plaintiff, however, argues that because TRS is made up of an elected (rather than appointed) board of trustees, the entity is more akin to a political subdivision that is not entitled to immunity. Dkt. 24 at 5–6. While Plaintiff is correct that TRS has some characteristics of a political subdivision, Jet ICU overlooks the fact that

TRS is a *statewide* entity (not just a county or local school board) directly created by the Texas Legislature. As for the board of trustees, the Act also provides the board with immunity from any liability arising from the "act or omission of a health care provider participating in the network" and from any acts or determinations when evaluating "the qualifications of a health care provider or of the patient care provided by a health care provider participating in the network." Tex. Ins. Code § 1575.355(a)(1); *id.* § 1575.356(1).

Finally, Defendant argues that Texas caselaw has already determined that TRS is an instrumentality of the state. Dkt. 31 at 13. Because "great deference" must be given to how Texas courts have characterized TRS, the Court agrees. *Monroe*, 93 F.4th at 1279.

Defendant principally relies on *Foster v. Teacher Retirement System*, 273 S.W.3d 883 (Tex. App. 2008). Dkt. 21 at 7. Like the allegations in the instant case, *Foster* involved a retired teacher who sued TRS and Aetna (retained by TRS to administer TRS's insurance plan) after Aetna denied the teacher's claim for health benefits. 273 S.W.3d at 885, 889. The Texas appellate court concluded that the Texas Legislature had not waived TRS's immunity from the retired teacher's suit. *Id.* at 887; *see also Kirby v. Health Care Serv. Corp.*, 88 F. Supp. 3d 717, 718–19, 720 (W.D. Tex. 2015) (following *Foster* and describing TRS as a "state agency" with sovereign immunity); *Austin Neurospine, PLLC v. Aetna Life Ins. Co.*, No. A-24-

CV-672-RP, 2025 WL 879569, at *3 (W.D. Tex. Jan. 31, 2025) (relying on *Foster* to find that "TRS is a state agency that has immunity from suit"), *report and recommendation adopted*, No. 1:24-CV-672-RP, 2025 WL 875810 (W.D. Tex. Mar. 20, 2025). As such, because Texas state and federal courts have uniformly found that TRS is a state agency entitled to sovereign immunity, factor one weighs heavily in Defendant's favor.

### b. What degree of control the State maintains over TRS

Next, the Court considers the degree of control the State still has over TRS. Based on the text of the Act, the Court finds that factor two slightly weighs in Defendant's favor. Eleventh Circuit caselaw shows that courts in this circuit consider things such as the appointment process for entity leadership, the State's oversight over the entity's decisionmaking, structural limits on the entity's discretion, the State's training requirements, consequences for failure to comply with the State's requirements, the State's approval of budgets, and whether the entity is subject to local control. *See, e.g.*, *Williams*, 421 F.3d at 1193–94; *Manders*, 338 F.3d at 1320–22; *Lightfoot*, 771 F.3d at 771–75; *Lesinski*, 739 F.3d at 603–04.

Here, while not required by the Act, TRS can request assistance from the Texas Department of Insurance when "implementing and administering this chapter." Tex. Ins. Code § 1575.055. However, some provisions require TRS to submit to State and public oversight. TRS must submit an annual report "to the

legislature and the [Texas] department [of Insurance] on the operation and administration of this chapter," *id.* § 1575.453, which "shall be made available for public inspection." *Id.* § 1575.455. As a state-created entity, TRS is also subject to Texas's confidentiality and disclosure of records laws under section 825.507 of the Texas Government Code. *Id.* § 1575.456. Moreover, TRS is also required to hold public meetings when the "Retirees Advisory Committee" conducts public hearings on group coverage. *Id.* § 1575.401; *id.* § 1575.406.

As for budgeting, the Texas Legislature has direct oversight of the TRS fund. As discussed above, the Texas Comptroller "is custodian of the fund," *id.* § 1575.301(a), and TRS is required to "certify to the comptroller the estimated amount of state contributions to be received by the fund for the next fiscal year under the appropriations authorized by this chapter." *Id.* § 1575.209. Along with the Comptroller's oversight, TRS must also report and "certify the amount necessary to pay the state contributions to the fund to the Legislative Budget Board; and the budget division of the governor's office." *Id.* § 1575.208. The Act even mandates that if there is a "variation between the certified amount and the actual amount due for the state fiscal year," the variation will be reconciled, and the State's "annual contributions to the fund shall be adjusted accordingly." *Id.* § 1575.210. Thus, the State control factor slightly favors finding that TRS is an arm of the State.

### c. *Where TRS derives its funds*

Factor three weighs in favor of finding that TRS is an arm of the State for the same reasons discussed in factor two. Eleventh Circuit authority, in evaluating this factor, considers several things, including whether the State controls the entity's budget, whether the entity generates its own revenue, whether the entity has the authority to tax, and whether the entity can issue bonds without the State's approval. *See, e.g., Williams*, 421 F.3d at 1193; *Manders*, 338 F.3d at 1323–24; *Lesinski*, 739 F.3d at 604–05. When considering this factor, the Court must also exercise particular care in evaluating state law in relation to the function at issue. *See Manders*, 338 F.3d at 1323 (considering whether "state funds are involved . . . in the particular functions [of the entity] at issue").

Here, Plaintiff argues that factor three weighs against TRS being an arm of the State since the insurance plan is "self-funded through employee contributions." Dkt. 24 at 6. But Plaintiff is only partially correct. While public schools and teachers must contribute to the self-funded TRS Plan, *see* Tex. Ins. Code § 1575.203; *id.* § 1575.204, the State must also contribute "to the fund an amount equal to 1.25 percent of the salary of each active employee." *Id.* § 1575.202; *see also id.* § 1575.302 ("The following shall be paid into the fund: (1) contributions from active employees and *the state*; (2) investment income; (3) *appropriations* for implementation of the group program . . ." (emphasis added)).

In addition to the previously discussed oversight the State exercises over TRS's budget via the Comptroller and certified reports sent to the legislature, *see id.* § 1575.208; *id.* § 1575.209, TRS is also dependent on appropriations from the legislature. *See Harris v. Univ. of Alabama*, 792 Fed. Appx. 713, 715 (11th Cir. 2019) ("Third, as far as the University's budget, the Alabama legislature allocates money to the University each year and requires reporting from the board on expenses."). Indeed, while TRS has the discretion to adopt a budget, *id.* § 1575.054, the fund is partially dependent on the "amount prescribed by the General Appropriations Act," *id.* § 1575.201(a), and the total costs for operating the TRS Plan "shall be shared among the state, the public schools, the active employees, the retirees, the surviving spouses, and the surviving dependent children *in the manner prescribed* by the General Appropriations Act." *Id.* § 1575.211 (emphasis added). The Act also requires TRS to keep a "contingency reserve account" at a certain level and mandates TRS to "include in each request for legislative appropriations to the group program the amount [TRS] determines to be necessary to maintain" the reserve. *Id.* § 1575.307(c).

Put simply, while it appears that TRS has substantial discretion in how it operates its insurance programs, the State still maintains direct oversight over TRS through the power of the purse. *See Kirby*, 88 F. Supp. 3d at 722 ("[T]he *Foster* court

certainly did implicitly agree the [TRS] Fund was comprised of state funds."). Thus, the Court finds factor three weighs in favor of finding TRS is an arm of the State.

### d.  Who is responsible for judgments against TRS

Finally, the fourth factor considers whether "the action is in essence one for the recovery of money from the state." *Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997). If so, "the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit." *Id.* This factor weighs in favor of applying sovereign immunity when "the state's treasury is directly implicated." *Lesinski*, 739 F.3d at 605 (alterations adopted).

Here, Plaintiff summarily dismisses this factor by stating, "the Texas Treasury is not liable for the judgments of the TRS plan. cite." Dkt. 32 at 6. The Court disagrees and readily finds that any judgment against TRS would involve taking money from Texas's treasury. As discussed above, the Texas Comptroller is the "custodian of the fund." Tex. Ins. Code § 1575.301(a). "In any state statute, 'comptroller' means the comptroller of *public accounts* of the State of Texas." Tex. Government Code § 403.001(a) (emphasis added). As Defendant correctly points out, the office of the Comptroller was "created by the Texas Constitution[,] is a constitutional office, filled by election, with powers and duties [] elaborated on in Chapter 403 of the Texas Government Code as well as in the Texas Tax Code." Dkt. 31 at 16–17 (citing Tex. Const. Art. 3, § 49(a); Tex. Government Code § 403.001 *et*

*seq.*; Tex. Tax Code § 111.001). The fact that the TRS fund also includes public school and active employee contributions is irrelevant because all the funds are collected by the Comptroller, held in public accounts under the Comptroller's control, and then disbursed by the Comptroller. *See* Tex. Ins. Code § 1575.301(a); Tex. Government Code § 403.001(a). As such, setting aside the fact that *Foster* already found that the Texas Legislature has not abrogated TRS's sovereign immunity, 273 S.W.3d at 887, any liabilities would presumably be taken from the Texas Treasury. *See Kirby*, 88 F. Supp. 3d at 722 ("Accordingly, the Court finds a judgment against BCBS would be the responsibility of TRS, and thus, would implicate the state treasury."); *Austin Neurospine*, 2025 WL 879569, at *4 (same).

Individually and collectively, the *Manders* factors weigh in favor of treating TRS as an arm of the State for Eleventh Amendment purposes. Accordingly, for the purposes of resolving this motion to dismiss, the Court holds that TRS is entitled to sovereign immunity.

## II.    Aetna's Sovereign Immunity

While all the *Manders* factors weigh in favor of finding that TRS is an arm of the State of Texas, this does not answer the question of whether Aetna (as the contractual administrator of the Plan for TRS) is also acting as a sovereign instrumentality. The Court will again apply the *Manders* factors to determine if Aetna is an arm of the State, but will also consider the Contract governing the TRS

16

and Aetna's relationship. *See Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1044 (11th Cir. 2007) (looking at the contract between the state agency and private entity to determine if immunity is extended); *Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.*, 208 F.3d 1308, 1311 (11th Cir. 2000) (same).

   a.  *How Texas Law Defines Aetna*

Beginning with factor one, the TRS Act says very little about third-party administrators who run a TRS plan. Third-party administrators, such as Aetna, are defined as "carriers" under the Act. *See* Tex. Ins. Code § 1575.002 (2) ("'Carrier' means an insurance company or hospital service corporation authorized by the department under this code."). TRS has the power to "contract directly with a health care provider, including . . . a carrier" like Aetna. *Id.* § 1575.109.

Although the Act does not substantially define the carriers with which TRS contracts, Texas caselaw has already determined that Aetna is an instrumentality of the State because it serves as the administrator of the Plan. Because "great deference" must be given to how Texas courts have characterized Aetna (in relation to its role as an administrator for TRS's Plan), the Court finds factor one weighs in Aetna's favor.[4] *Monroe*, 93 F.4th at 1279.

---

[4] However, the Texas Supreme Court has not directly decided that derivative sovereign immunity applies to contractors of state entities. *See Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 751 (Tex. 2019) ("We have suggested, but never held, that a non-governmental entity can share a political subdivision's immunity derivatively.").

Again, *Foster v. Teacher Retirement System* is persuasive. To determine whether Aetna was similarly protected and immune from suit, the Texas court examined the contract between Aetna and TRS. *Foster*, 273 S.W.3d at 888–90. The court found that Aetna acted as TRS's agent for the benefit of TRS since Aetna had "discretionary authority" to carry out its contractual duties; the State fully funded the insurance plan; Aetna had no financial stake in whether a claim was approved or denied; TRS has the exclusive right to determine the terms of the insurance plan and could amend or terminate the plan at any time; and TRS agreed to indemnify Aetna in connection with its performance under the contract. *Id.* As such, *Foster* held that Aetna was entitled to immunity because "Aetna simply provide[d] administrative services to facilitate the provision of health care to retirees." *Id.* at 890; *see also Kirby*, 88 F. Supp. 3d at 721 (federal district court following *Foster* and extending sovereign immunity to Blue Cross Blue Shield of Texas as the third-party administrator of a TRS plan); *Austin Neurospine*, 2025 WL 879569, at *4 (federal district court following *Foster* and *Kirby* and extending sovereign immunity to Aetna as the administrator of a TRS plan).[5]

---

[5] Plaintiff calls Defendant's arguments "novel" and "dangerous" (Dkt. 32 at 8), but following *Foster*, Texas courts (both state and federal) have uniformly held that a private third-party administrator to a state-created insurance program shares the same immunity from liability and suit as the governmental entity for which it contracts. *See Bellamy v. Allegiance Benefit Plan Mgmt., Inc.*, 696 S.W.3d 751, 763–64, 767 (Tex. App. 2024) (collecting cases and finding that "the governmental unit's immunity protections extend to and may be asserted by the third-party administrator that is retained to supervise the unit's self-funded insurance plan"); *United Healthcare Choice Plus Plan for City of Austin Emps. v. Lesniak*, No. 03-15-00309-CV, 2015 WL 7951630, at *2–3 (Tex. App. Dec. 1, 2015) (extending sovereign immunity to United HealthCare as a third-party administrator of the City of Austin's self-funded health plan); *Stegall v. TML Multistate Intergovernmental Emp. Benefits Pool, Inc.*, No. 05-18-00239-CV, 2019 WL 4855226, at *5 (Tex. App. Oct. 2, 2019) (extending sovereign immunity to UMR, Inc. as a third-party administrator

As in *Foster*, this Court has the full Contract between Aetna and TRS, and similar dispositive provisions are present. The Contract before the Court shows that: (1) the TRS Plan is fully funded by the "Retired School Employees Group Insurance [trust] Fund[,]" and "[t]he Legislature of the State of Texas appropriates funding for the Program on a biennial basis." (Dkt. 31-1 at 1, 4, 48–49); (2) Aetna had no financial stake in the approval or denial of any claim that was submitted to Aetna by a plan participant (Dkt. 31-1 at 6–7, 21); (3) Aetna only performed administrative services in the capacity as a third-party administrator for and on behalf of the TRS (Dkt. 31-1 at 5–11); (4) although Aetna has "discretionary authority," Aetna is still "accountable to TRS with respect to all duties and power assigned to Aetna under this Contract" (Dkt. 31-1 at 5); (5) TRS retained "sole and complete authority to determine eligibility of persons to participate" in the Plan (Dkt. 31-1 at 5); (6) TRS has the exclusive right to determine or amend the Plan at any time (Dkt. 31-1 at 1, 4–5); and (7) TRS agreed to indemnify Aetna from any claim asserted against it based on its performance under the agreement (Dkt. 31-1 at 5, 28).[6] *See also Kirby*,

---

for a multistate intergovernmental self-insurance risk pool); *Humana Ins. Co. v. Mueller*, No. 04-14-00752-CV, 2015 WL 1938657, at *2, 5 (Tex. App. Apr. 29, 2015) (extending sovereign immunity to Humana, who was the Plan Manager of the City of San Antonio Housing Authority's self-funded health care plan); *see also McAllen Anesthesia Consultants, P.A. v. United Healthcare Servs., Inc.*, No. 7:14-CV-913, 2015 WL 9257154, at *8 (S.D. Tex. Dec. 14, 2015) (federal district court extending sovereign immunity to the third-party administrator of the Employees Retirement System of Texas's health insurance plan).

[6] Unlike the contract in *Foster*, the Court notes that the Contract in this case explicitly states that Aetna is not "considered or deemed to be employees [or] agents" of TRS. Dkt. 31-1 at 25. Regardless, the Court still finds that factor one weighs in Aetna's favor, given all the aforementioned similarities to the contract in *Foster*.

88 F. Supp. 3d at 721–22 (examining the contract between TRS and the third-party administrator); *Austin Neurospine*, 2025 WL 879569, at *3–4 (same).

Put simply, Aetna's role and authority in administering the Plan are analogous to and consistent with circumstances where Texas caselaw has extended the protections of governmental immunity to a private entity that acts in the capacity of an administrator for a governmental unit. *See e.g.*, *Foster*, 273 S.W.3d at 889–90. Factor one weighs in Defendant's favor.

### b.  *What degree of control the State maintains over Aetna*

When considering the degree of control over Aetna, the Court must look not only to the text of the TRS Act but also to the Contract between TRS and Aetna. *See Monroe*, 93 F.4th at 1280 ("The degree of control that [the State] exercises over the Board 'must be assessed in light of the particular function in which the [Board] was engaged when taking the actions out of which liability is asserted to arise.'" (quoting *Manders*, 338 F.3d at 1308)); *Lesinski*, 739 F.3d at 603.

 Only two statutory provisions outline any control over a carrier like Aetna. First, the Act requires the carrier to provide an accounting report to TRS in a form approved by TRS. Tex. Ins. Code §§ 1575.451(b), (c). Second, the Act requires any contract between TRS and a carrier to contain provisions where the carrier must "furnish to the trustee in a timely manner reasonable reports that the trustee determines are necessary to implement this chapter; and permit the trustee and the

state auditor to examine records of the carrier as necessary to implement this chapter." *Id.* § 1575.454. These provisions alone are not enough to tilt factor two in Aetna's favor.

The Contract between Aetna and TRS, however, demonstrates that TRS has a high degree of control over its third-party administrator/contractor, particularly in the context of paying out claims and litigation. The Contract acknowledges that "TRS has the sole and complete authority to determine eligibility of persons to participate in the Program" and the exclusive right to determine the terms of the Plan, as well as to amend provisions. Dkt. 31-1 at 1, 4–5. Although Aetna possesses "discretionary authority," Defendant is still "accountable to TRS with respect to all duties and powers assigned." *Id.* at 5. Further, while Aetna is indemnified by TRS when paying out claims, the Contract mandates that Aetna must first "**receive permission from the Texas Legislature to sue TRS as Trustee of the Program, and the Texas Legislature provides an appropriation from the general revenue fund in an amount adequate and specifically designated to satisfy the judgment[**.]" *Id.* at 28 (emphasis in original).

Most importantly, as evidence that Aetna is treated as an arm of the State under the Contract, Aetna is contractually required to raise the defense of sovereign immunity and pursue it through the appellate levels to a final judgment when sued. *Id.* at 27 ("Contractor shall file an appropriate motion to dismiss based on sovereign

immunity in the legal action and pursue this jurisdictional issue through the appellate levels to a final judgment. For purposes of this paragraph, 'an appropriate motion to dismiss based on sovereign immunity' means raising the defense of sovereign immunity on behalf of Contractor."). The State (via TRS) exercises sufficient control over Aetna, including requiring Aetna to obtain appropriations from the Texas Legislature and controlling Aetna's litigation strategy, which favors a finding of sovereign immunity. *See Monroe*, 93 F.4th at 1282; *Lesinski*, 739 F.3d at 603–04.

    *c.   Where Aetna derives its funds*

At first, factor three seems to weigh against finding that Aetna is an arm of the State. Indeed, the Contract has an entire section outlining the "administration charges" that TRS must pay to Aetna for its services as a third-party administrator of the Plan. Dkt. 31-1 at 19–20.[7] However, "[w]hether a defendant is an 'arm of the State' must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." *Manders*, 338 F.3d at 1308; *see also Shands*, 208 F.3d at 1311 ("The pertinent inquiry is not into the nature of [an entity's] status in the abstract, but its function or role in a particular context.").

---

[7] In any event, the Act states that the composition of the TRS fund is composed in part of "*appropriations* for implementation of the group program." Tex. Ins. Code § 1575.302(3) (emphasis added). As such, even the "administration charges" TRS pays to Aetna could be considered State funds since it would be "money spent by [TRS] to administer the group program." *Id.* § 1575.303(a)(3).

Here, the "particular context" is Aetna's refusal to pay the Jet ICU's emergency air transportation claim fully. *See* Dkt. 1 ¶ 51. Therefore, factor three is really asking where Aetna derives its funds to pay out claims submitted by healthcare providers or members. In the context of paying out claims, TRS has contractually agreed it is solely responsible for making payments. Dkt. 31-1 at 5 ("The Trust shall have all liability for funding all valid claims and benefits under the Program and the Plans. Aetna assumes no liability hereunder for funding valid claims and benefits under the Program and the Plans."). As such, any money paid out on a claim must come from the TRS fund, which the comptroller holds in "public accounts." *See* Tex. Ins. Code § 1575.301(a); *id.* § 1575.302(3); *id.* § 1575.303(a)(2); Tex. Government Code § 403.001(a); *Kirby*, 88 F. Supp. 3d at 722–23.

Moreover, as discussed previously, when Aetna sues TRS under the indemnity provision, any funds Aetna receives must come from the Texas Legislature as an "appropriation from the general revenue fund in an amount adequate and specifically designated to satisfy the judgment[.]" Dkt. 31-1 at 28 (emphasis omitted). There is no doubt that such funding is directly derived from the State. *See* Tex. Ins. Code §§ 1575.302(1), (3) (noting the composition of the TRS fund, which explains the fund is composed in part of contributions from the State and monies "appropriate[ed] for implementation of the group program"). This State involvement (via TRS) in paying claims is sufficient to tilt the third factor of the

Eleventh Amendment analysis toward immunity. *See Monroe*, 93 F.4th at 1282. ("If 'state funds are involved to some extent in the particular functions . . . at issue,' that is 'sufficient to tilt the [source of funds] factor of the Eleventh Amendment analysis toward immunity' even if some other entity 'bears the major burden of funding.'" (quoting *Manders*, 338 F.3d at 1323–24)).

### d.  Who is responsible for judgments against Aetna

Finally, regarding the final *Manders* factor of who is responsible for judgments against Aetna, the analysis is largely the same as the previous factor. Again, TRS has agreed it is solely responsible for "all liability for funding all valid claims and benefits under the Program and the Plans." Dkt. 31-1 at 5. As a result, any money paid out would come from the TRS fund that the Comptroller holds. *See* Tex. Ins. Code § 1575.301(a); Tex. Government Code § 403.001(a). TRS has also indemnified Aetna for "losses, liabilities, damages, expenses or other costs or obligations . . . resulting from and arising out of claims, demands or lawsuits brought against Contractor by third parties in connection with the exercise of its power and duties[.]" Dkt. 31-1 at 28.

Therefore, any satisfaction of judgments of the kind sought by Jet ICU for the unpaid portions of its claim will require the Texas Legislature to approve "appropriation[s] from the general revenue fund." *Id.* at 28; *see also id.* at 48 ("The Legislature of the State of Texas appropriates funding for the Program on a biennial

basis."); *Kirby*, 88 F. Supp. 3d at 722 ("Accordingly, the Court finds a judgment against BCBS would be the responsibility of TRS, and thus, would implicate the state treasury."); *Austin Neurospine*, 2025 WL 879569, at *4 ("Aetna has further shown that a money judgment against it would come from the state treasury as 'the assets of the Trust shall be the exclusive source for all funding of . . . liabilities . . . arising under the Program.'"). Because "the state's treasury is directly implicated," the final factor is firmly in favor of finding that Aetna is an arm of the State. *Lesinski*, 739 F.3d at 605 (alterations adopted).

In summary, the Court concludes that of the four *Manders* factors, all weigh in favor of finding that Aetna is entitled to sovereign immunity for its claim adjudication activities. Aetna has met its burden in a factual attack under Rule 12(b)(1) to establish that it shares in Texas's sovereign immunity. As such, the Motion is due to be granted to the extent that Aetna contends the Court lacks subject matter jurisdiction. Because immunity applies, the Court also declines to consider Defendant's other arguments regarding preemption, venue, and failure to state a claim.

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that:

1.  Defendant Aetna's Motion to Dismiss, Dkt. 21, is **GRANTED**.

2. Plaintiff Jet ICU's Complaint, Dkt. 1, is **DISMISSED without prejudice.**

3. Plaintiff Jet ICU's Motion for Oral Argument, Dkt. 25, is **DENIED as moot**.

4. The Clerk is **DIRECTED** to **TERMINATE** all pending motions and deadlines, and to **CLOSE** this case.

**DONE AND ORDERED** at Tampa, Florida, on June 4, 2025.

*/s/ William F. Jung*

**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

<u>**COPIES FURNISHED TO**</u>:
Counsel of Record

26